## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| U.S. Commodity Futures Trading Commission, | ) ) ) |
|  | ) |
| Plaintiff, | )   No. 10-737 |
|  | ) |
| v. | ) |
|  | ) |
| Integra Capital Management LLC, Rodney W. Whitney and Nicholas T. Cox, | ) ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## COMPLAINT FOR INJUNCTIVE AND OTHER
## EQUITABLE RELIEF AND FOR CIVIL MONETARY
## PENALTIES UNDER THE COMMODITY EXCHANGE ACT

### I. SUMMARY

1.      From at least September 2006 to August 2009 ("the relevant time"),

Rodney W. Whitney ("Whitney") and Nicholas T. Cox ("Cox"), individually and as

controlling persons of Integra Capital Management, LLC ("Integra Capital") (collectively

"Defendants"), solicited and accepted at least $3 million from at least sixteen individuals

for the purpose of investing in a commodity pool.  Defendants also solicited at least five

individuals for the purpose of trading off exchange foreign currency contracts ("forex"),

the funds for which were initially in accounts that were not part of the commodity pool,

but were later pooled and traded with the funds of other pool participants.

2.      Whitney and Cox represented to prospective and current pool participants

that Integra Capital operated a commodity pool that day-traded stock index futures on

1

behalf of participants and earned 3% to 5% monthly returns with no or virtually no losing months.

3.      Whitney provided at least two pool participants with false account statements and at least four with false 1099 tax forms for tax years 2007 and 2008 showing that their investments with Integra Capital were profitable when, in reality, Defendants' trading accounts consistently lost money.

4.      Whitney and Cox also misappropriated participant funds, using them for personal expenses instead of commodity futures or forex trading, including travel, dining and entertainment, purchases of real estate and funding other business ventures.

5.      By making false statements to at least seven pool participants regarding profits and losses and risk of loss, issuing false account statements to at least two pool participants and false 1099 tax forms to at least four participants, and misappropriating pool participants' funds, Defendants Whitney, Cox and Integra Capital cheated, defrauded and deceived pool participants, and prospective pool participants, in violation of Sections 4b(a)(2)(i), (ii) and (iii) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6b(a)(2)(i),(ii) and (iii) (2006), for violations occurring before June 18, 2008, and Sections 4b(a)(1)(A), (B) and (C) and 4b(a)(2)(A), (B) and (C) of the Act, as amended by the Food, Conversation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651, to be codified at 7 U.S. C. §§ 6b(a)(1)(A), (B), (C) and 6b(a)(2)(A), (B), (C), for violations on or after June 18, 2008, and Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2006).

6.     Integra Capital acted in a capacity requiring registration with the Commodity Futures Trading Commission ("CFTC") as a commodity pool operator ("CPO") without the benefit of registration as such, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

7.     Whitney and Cox acted in a capacity requiring registration with the CFTC as associated persons ("AP") of a CPO without the benefit of registration as such, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).  Because Integra Capital knew or should  have known that Whitney and Cox were not registered as APs of a CPO, but permitted them to become or remain associated with it in a capacity of APs, Integra Capital also violated Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

8.     The violations of Sections 4b(a), 4*o*(1) and 4k(2) of the Act by Whitney and Cox were committed within the scope of their employment with Integra Capital. Therefore, Integra Capital is liable for those violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

9.     Whitney and Cox were controlling persons of Integra Capital and did not act in good faith or knowingly induced, directly or indirectly, Integra Capital's act or acts in violation of Sections 4b(a), 4*o*(1), 4m,(1), and 4k(2) of the Act.  Integra Capital is therefore liable for these violations of the Act pursuant to Section 13(b) of the Act 7 U.S.C. § 13c(b) (2006).

10.     Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks rescission, restitution,

3

disgorgement, civil monetary penalties and such other equitable relief as this Court may deem necessary or appropriate.

## II.  <u>JURISDICTION AND VENUE</u>

11.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action in the proper District Court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants Whitney and Cox reside in this District, and the acts and practices in violation of the Act have occurred within this District.

13.     Unless restrained and enjoined by this Court, Defendants are likely to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

## III.  <u>THE PARTIES</u>

14.     Plaintiff **<u>Commodity Futures Trading Commission</u>** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.,* and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.*

15.     Defendant **Integra Capital Management, LLC** was established in September 2006 in North Carolina and operated out of an office in High Point, North Carolina until approximately January 2009, when Whitney closed the office because he could no longer pay for it.  For a short time thereafter, Integra was operated out of Whitney's residence in Archdale, North Carolina.  However, it appears that Integra ceased conducting business in August 2009.  Integra Capital's articles of organization list Whitney as the president and a member, organizer and registered agent of Integra Capital. The articles of organization list Cox as a member and organizer of the firm.  Integra Capital represented to prospective and existing pool participants that it operated a commodity pool that traded stock index futures, and represented to at least two individuals that it traded forex for customers outside of the commodity pool.  Integra Capital has never been registered with the Commission in any capacity.

16.     Defendant **Rodney W. Whitney** resides in Thomasville, North Carolina. He is a founding member, manager, organizer, and the president and registered agent of Integra Capital, and acts as an AP of the firm.  He has never been registered with the Commission in any capacity.

17.     Defendant **Nicholas T. Cox** resides in Denton, North Carolina.  He is a founding member, manager, and organizer of Integra Capital and, prior to his withdrawal from the firm in January 2009, acted as an AP of Integra Capital and as the firm's principal trader.  He has never been registered with the Commission in any capacity.

# IV.  FACTUAL BACKGROUND

## A.    Statutory Background

18.    A futures commission merchant ("FCM") is defined in Section 1a(20) of the Act, 7 U.S.C. § 1a(20), as an individual, association, partnership, corporation or trust that solicits or accepts orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market and that accepts payment from or extends credit to those whose orders are accepted.

19.    A CPO is defined in Section 1a(5) of the Act, 7 U.S.C. § 1a(5), as any firm or individual engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and that, in connection therewith, solicits, accepts, or receives from others funds, securities, or property, either directly through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market.

20.    An AP is defined in Section 4k of the Act, 7 U.S.C. § 6k, and Commission Regulation 1.3(aa)(1) and (2), 17 C.F.R. § 1.3(aa)(1) and (2), with certain qualifications, as a natural person associated with any Commodity Trading Advisor ("CTA"), CPO or FCM as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves: (i) the solicitation or acceptance of customers' or options customers' orders; or (ii) the supervision of any person or persons so engaged.

6

### B.  Integra Capital's Trading Accounts

21.  Defendants opened and funded fifteen trading accounts from January 2007 through March 2009, which traded primarily stock index futures and also some forex from August 2008 through March 2009.  The accounts were primarily held in the name of Integra Capital, but two were held in Whitney's name and one was held in the name of Epic Capital Management, LLC ("Epic"), a firm Cox started in January 2009.

22.  None of Defendants' accounts were profitable, and they collectively lost money in all but three of the twenty seven months they were active.  Specifically, a total of approximately $1.2 million was pooled and deposited into Defendants' fifteen trading accounts from a bank account in the name of Integra Capital containing participant funds between January 2007 and March 2009.  By March 2009, approximately $300,000 had been withdrawn and deposited into an Integra Capital bank account, and over $830,000 had been lost trading.  Defendants ceased trading their accounts in March 2009 and closed all but one of them, which has remained dormant since August 2009.

23.  Whitney and Cox first solicited and accepted funds from customers to trade commodity futures with Integra Capital in September 2006, but did not begin trading until January 8, 2007.  Defendants continued to solicit and accept funds from customers for the purpose of trading commodity futures and forex until August 2009.

### C.  Solicitation Fraud

24.  Beginning in October 2006, David Harkey ("Harkey") visited Integra Capital's office in Highpoint, North Carolina on a weekly basis.  During his visits, Harkey observed Whitney and other individuals at computer terminals engaged in what

appeared to be commodity futures trading.  During his first visit to the office, Whitney told Harkey that he used a brokerage house in Chicago for his trading and had several accounts with the brokerage house through which he traded.

25.     To persuade them to invest with Integra Capital, Whitney and Cox represented to Harkey and at least six other prospective participants that Integra Capital was earning between 3% and 5% per month trading commodity futures for its existing participants with no losing months, and that they could guarantee participants a return of at least 3% per month.  This rate, however, was determined solely by Whitney's and Cox's review of the rates of return achieved by successful hedge funds published in a magazine article and was not based on Whitney's, Cox's, or Integra Capital's past trading history.

26.     In June or July 2008, Whitney also told at least one prospective participant that Integra Capital would pay him 3% of his principal investment per month regardless of whether Integra Capital's trading was profitable, and provided at least one other prospective participant with a document entitled "Integra Capital Management Hedge Fund Prospectus" in the fall of 2007 stating that Integra Capital paid monthly dividends of 3% per month, and all other gains on the principal amount would go to Integra for fees and commissions.  Cox reviewed a draft of the prospectus before it was sent to prospective participants.

27.     Additionally, in June or July 2008, Whitney told at least one participant that Integra Capital had earned trading profits in 17 of the previous 18 months when, at that

time, Integra had lost money in all but two of the eighteen months it had traded. During the relevant time, Integra Capital actually lost money in 24 of the 27 months it traded.

28.     Participants received contracts from Whitney on Integra Capital's letterhead signed by Whitney that acknowledged receipt of their investment and guaranteed returns from 3% to 5% "of the initial deposit amount on a monthly basis." Whitney drafted the template of these participant contracts in consultation with Cox, and Cox reviewed several individual contracts thereafter before they were sent to participants. The terms of the contracts varied slightly over time and from participant to participant, but basically stated that Integra Capital would "pay a minimum 3%" monthly return for investments up to $100,000, 4% monthly returns for investments up to $300,000, and 5% monthly returns for investments that exceed $300,000.

29.     Although the contracts included a disclaimer that investments with Integra Capital "involved substantial risk and any or all of your principal investment may be lost," Whitney downplayed the risk of loss by telling participants that the statement was only in the contract because he was required by law to include it.

30.     Whitney falsely told prospective participants that any losses would be limited to 10% of their investment because Integra Capital only traded 10% of the pooled funds at a time, and that the remaining funds would be held in an escrow account. However, he told at least three other prospective participants that losses would be limited to 1% of their investment because Integra Capital only traded 1% of pooled participant funds at one time, and the remaining funds would be kept in an interest bearing account. By the spring of 2007, however, within approximately six months of Integra Capital's

9

initial trades, Whitney and Cox had already suffered consistent net losses on their commodity futures trades but failed to disclose those losses to pool participants. To the contrary, they falsely represented to participants that they were running a successful trading operation.

**D.    False Reports**

31.    Shortly after investing with Integra Capital, pool participants began receiving monthly checks from Whitney that he represented were profits their investments were earning from trading commodity futures. Whitney generally signed the checks and Cox was aware that Whitney was doing so and that participants believed they were being paid the profits resulting from Integra Capital's successful trading of their funds. Defendants paid participants approximately $1,000,000 during the relevant time. Based on the monthly checks Integra Capital sent to them, at least five participants invested additional funds with Integra Capital, and continued to receive monthly checks from Integra Capital after making subsequent investments, but the amount of the checks increased. Whitney and Cox continued to represent to participants that these checks resulted from profits Integra Capital was earning from trading commodity futures on their behalf. In reality, Integra Capital was consistently losing money trading commodity futures.

32.    Whitney provided false account statements to some participants reflecting significant profits with no losing months when in fact all of Integra Capital's trading accounts suffered losses. For example, on June 3, 2007, Whitney gave a four line statement on Integra Capital's letterhead to Harkey entitled "Managed Fund Account

Report" stating that Harkey had earned $22,335.65 on his $75,000 investment – a 29.7% return in less than nine months – and that another $50,000 investment he made had grown to $76,515.35 and had earned a 53.5% return in five months. In reality, Integra Capital's trading accounts had lost over $60,000 by June 2007. As a result of these misrepresentations, Harkey invested an additional $100,000 with Integra Capital at the end of June 2007 that was drawn from his IRA account.

33. Whitney also provided participants with false 1099 tax forms for 2007 and 2008. For example, Harkey received a 1099 tax form for 2007 at the beginning of 2008 reflecting a $48,000 gain, Ted Smith ("Smith") received separate 1099s for the 2008 tax year for his personal and company investments in January 2009 showing a gain of $226,079.00 and $81,500 respectively, Hallie Scott ("Scott") received a 1099 tax form for 2008 reflecting a $5,465 gain, and Nelson Teague ("Teague") received 1099 tax forms in early 2008 and 2009 showing large gains for 2007 and 2008. In reality, Integra Capital lost over $200,000 trading in 2007 and over $500,000 trading in 2008.

**E. Defendants' Misrepresentations Regarding the Location of Participant Funds**

34. In December 2008, Whitney and Cox traveled to Florida to meet with Tom Reavis ("Reavis"), the President of Worldwide Futures Systems ("Worldwide"), a branch office of Rosenthal Collins, LLC, a registered FCM, to inquire about opening a commodity futures trading account with Worldwide.

11

35.     Whitney and Cox told Reavis that they were raising money from family and friends in the name of Integra Capital, and that they were interested in trading commodity futures on their behalf at Worldwide.

36.     In January 2009, Whitney represented to at least four Integra Capital participants that he deposited their funds in an account at Worldwide because Worldwide was achieving better returns trading commodity futures than Integra Capital.  However, Whitney and Cox never opened any accounts with Worldwide for Integra Capital's participants.

37.     For example, Whitney convinced Teague to withdraw approximately $76,000 from his IRA account and incur penalties and taxes by telling him that Integra Capital would invest the money with Worldwide Futures, where Whitney claimed it would earn enough money in three months trading commodity futures to cover the taxes and penalties.  Whitney also told other pool participants that Worldwide required a minimum $500,000 investment to open an account when Worldwide actually only required a $20,000 minimum investment.

F.     **Demise of Integra Capital and Participants' Inability to Obtain Return of Their Funds**

38.     Several participants have been unable to obtain the return of their funds. Specifically, in January 2009, Smith, who had a principal investment of $600,000 with Integra Capital, requested to withdraw $350,000.  After misrepresenting to Smith that his funds were at Worldwide and that there was a "90 day lock up period," Whitney

12

informed Smith that he would return the $350,000 once he solicited and accepted funds from new participants. To date, Smith has not received any portion of the $350,000.

39.     In early March 2009, Whitney told Teague that he could not give him his monthly interest check because the funds had not yet come in from Worldwide. About a week later, Teague followed up with Whitney to ask when he would receive his funds, and Whitney now told him that he did not have the funds to pay him.

40.     At approximately the same time, Whitney informed Integra Capital's other participants that he had lost all of their funds trading, there was no money left in Integra Capital, he had closed the Integra Capital office and let the employees go, and that he could not honor any requests for redemptions.

41.     In conversations with some participants, Whitney blamed Cox for losing money trading for Integra Capital, and claimed that he (Whitney) had lost additional funds trading in an attempt to recoup Cox's losses. Whitney told some participants that he had moved Integra Capital's trading operations to his house. He asked them to forgo their interest checks and agree to allow him to continue to trade the remaining principal in order to try to recoup the losses.

42.     To persuade participants to agree to this strategy, Whitney falsely told them that all or most of the other participants had agreed to this plan. He added that if they did not agree to the plan he would be forced to file for bankruptcy, and they would be letting all of the other participants down.

43.     However, most of the participants did not agree to allow Whitney to continue trading their funds and informed Whitney that they wanted him to liquidate

13

whatever assets were left of Integra Capital and divide them among the participants. To date, at least six of the participants have not received redemptions of their principal investments.

44.     Whitney also falsely told at least two participants that he had filed for bankruptcy in March 2009, and that Integra Capital's bank accounts were frozen. However, neither Whitney nor Integra Capital filed for bankruptcy in March 2009 and Integra Capital's bank accounts were not then, and are not now, frozen.

### G.     Misappropriation of Participant Funds

45.     In addition, Whitney and Cox misappropriated money invested with Integra Capital for the purpose of trading commodity futures and forex to benefit themselves, including paying for personal expenses, funding real estate investments, and funding other companies they own and operate.

46.     Specifically, Whitney and Cox deposited approximately $3.7 million into the Integra Capital bank account at Community One Bank. At least $3 million of these funds Whitney and Cox solicited and accepted from Integra Capital's participants for the purpose of trading commodity futures and forex, but only $1.2 million was actually used for that purpose. Approximately $1,000,000 of these funds were returned to participants, but Whitney and Cox used at least $141,000 to benefit themselves, including $30,000 for travel, dining and entertainment, over $11,000 on automobile related expenses, and over $100,000 on real estate related expenses and other companies they owned and operated. The remaining funds were used for Integra Capital's office related expenses and other purposes that are unknown at this time.

14

47.     Whitney also admitted that he and Cox used funds they solicited and accepted from participants for the purpose of trading commodity futures to purchase real estate.

**H.      Whitney is a Controlling Person of Integra Capital**

48.     At all relevant times, Whitney was a 50% owner, and acted as an AP, of Integra Capital, which acted as a CPO.  Integra Capital's articles of organization list Whitney as the president, a founding member, and an organizer and registered agent of the firm.

49.     Whitney exercised control over the day-to-day business operations of Integra Capital during the relevant period.  He is a signatory on at least three Integra Capital bank accounts, two at Community One Bank in Asheboro, North Carolina, and one at Bank of North Carolina in Thomasville, North Carolina, and on its commodity futures trading and forex accounts.  He also hired and supervised Integra Capital's employees and was authorized to fire employees as well.

50.     Whitney solicited prospective pool participants and at least five forex investors.  These five forex investors and most, if not all, of Defendants' other participants were not "eligible contract participants" as that term is defined in Section 1a(12)(A)(ix) of the Act, 7 U.S.C. § 1a(12) (2006).

51.     Whitney knowingly induced Integra Capital's violations in that he personally participated in the fraud by knowingly misrepresenting profit potential, risk of loss, and trading profits to prospective and actual pool participants and at least five forex investors, misappropriating their money, and issuing false statements.

## I. Cox is a Controlling Person of Integra Capital

52.     At all relevant times, Cox was a 50% owner, and acted as an AP, of Integra Capital, which acted as a CPO.  Integra Capital's articles of organization list Cox as a founding member and organizer of the firm.

53.     Cox was primarily responsible for trading commodity futures and forex on behalf of Integra Capital's participants during the relevant period.  He is a signatory on at least two Integra Capital bank accounts and on several of its commodity futures and forex trading accounts.  Cox also hired and supervised Integra Capital's employees and was authorized to fire employees as well.

54.     Cox solicited prospective pool participants and forex investors.  These forex investors and most, if not all, of Defendants' other participants were not "eligible contract participants" as that term is defined in Section 1a(12)(A)(ix) of the Act, 7 U.S.C. § 1a(12) (2006).

55.     Cox knowingly induced Integra Capital's violations in that he personally participated in the fraud by knowingly misrepresenting profit potential, risk of loss, and trading profits to prospective and actual pool participants and forex investors, and misappropriating their money.

## J. Recent Developments

56.     On May 27, 2009, Whitney sent Integra Capital participants an e-mail stating that Cox had lost $400,000 of their funds trading for Integra Capital in the past twelve months, $200,000 of which he lost trading options, and that Integra currently had $250,000 in assets.

57.     Whitney requested that participants agree to allow him to trade with $25,000 of those assets to start in an attempt to recoup their losses.  All profits would be paid out to participants and he would "only be taking a modest salary during this rebuilding process."  He also stated that he intended "to increase the amount of money traded in the second month and so on," and "the process of returning all client principle to them may take two or three years, but I feel it's a better alternative then shutting the company down."  It does not appear that any participants accepted Whitney's proposal.

58.     On August 19, 2009, Whitney opened another commodity futures trading account at Dorman and funded it with $5,000 from a bank account at Bank of North Carolina in the name of Integra Capital.  The account is currently open, but does not appear to have been actively traded since August 2009.

### K.     The Nature of the Transactions

59.     Neither Defendants nor the purported counterparties to the forex transactions were financial institutions, registered brokers or dealers, insurance companies, financial holding companies, or investment bank holding companies or the APs of financial institutions, registered brokers or dealers, insurance companies, financial holding companies, or investment bank holding companies.

60.     Some or all of Defendants' participants were not "eligible contract participants" as that term is defined in Section 1a(12)(A)(xi) of the Act, 7 U.S.C. § 1a(12)(A)(xi) (2006).  An "eligible contract participant," as relevant here, is an individual with total assets in excess of (i) $10 million, or (ii) $5 million and who enters the transaction in order to hedge risk.

17

61.     The forex transactions purportedly conducted by Defendants on behalf of their participants were entered into on a leveraged or margined basis.  Defendants were required to provide only a percentage of the value of the forex contracts that they purchased.

62.     The forex transactions purportedly conducted by Defendants neither resulted in delivery of actual currency within two days nor created an enforceable obligation to deliver between a seller and a buyer that had the ability to deliver and accept delivery, respectively, in connection with their lines of business.  Rather, these forex contracts purportedly remained open from day to day and ultimately were offset without anyone making or taking delivery of actual currency (or facing an obligation to do so).

## V. <u>VIOLATIONS OF THE COMMODITY EXCHANGE ACT</u>

### <u>COUNT ONE</u>

**VIOLATIONS OF SECTION 4b(a) OF THE ACT:
FUTURES FRAUD BY MISREPRESENTATION, OMISSION,
MISAPPROPRIATION, AND FALSE REPORTS**

63.     The allegations set forth in paragraphs 1 through 62 are re-alleged and incorporated by reference herein.

64.     Prior to being amended by the CRA, Sections 4b(a)(2)(i), (ii) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (ii) and (iii), made it a violation:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on  behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such

commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

> (i) to cheat or defraud or attempt to cheat or defraud such other person;
>
> (ii) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof; [or]
>
> (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act or agency performed with respect to such order or contract for such person . . . .

7 U.S.C. §§ 6b(a)(2)(i), (ii), and (iii) (2006).

65. As amended by the CRA, Sections 4b(a)(1)(A), (B) and (C) of the Act similarly make it a violation:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person;
>
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;[or]
>
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract of the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person . . .

Section 4b(a)(1)(A), (B) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A), (B), and (C).

66.     As set forth above, beginning in at least September 2006 and continuing through at least August 2009, Defendants (1) solicited investments through fraudulent misrepresentations about Integra Capital's trading performance, profit guarantees and the risk of loss; (2) misappropriated funds received from pool participants for the purpose of trading commodity futures; and (3) Whitney made or caused to be made at least six false account statements, which were issued to at least two participants who invested money with Integra Capital, as well as at least six false IRS form 1099s, which were issued or communicated to at least four participants.

67.     Defendants engaged in the acts and practices above knowingly or with reckless disregard for the truth.

68.     Defendants therefore:  (a) violated Sections 4b(a)(1)(A), (B) and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A), (B) and (C), for conduct occurring on or after June 18, 2008; and (b) violated Sections 4b(a)(2)(i), (ii) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (ii) and (iii) (2006), for conduct occurring before June 18, 2008.

69.     The actions and omissions of Whitney and Cox, as described in this Count One, were committed within the scope of their employment with Integra Capital and, therefore, Integra Capital is liable for their actions constituting violations of Sections 4b(a)(2)(i), (ii) and (iii) of the Act and Sections 4b(a)(1)(A), (B) and (C) of the Act, as amended by the CRA, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

70.     During the relevant time, Whitney and Cox directly and indirectly controlled Integra Capital, and did not act in good faith or knowingly induced, directly or

indirectly, the acts constituting the violations described in this Count One. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Whitney and Cox are therefore liable for the violations described in this Count One to the same extent as Integra Capital.

71.     Each material misrepresentation or omission, misappropriation or false report from at least September 2006 to August 2009, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(i), (ii) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (ii) and (iii) (2006), with respect to acts occurring before June 18, 2008; and Sections 4b(a)(1)(A), (B) and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C §§ 6b(a)(1)(A), (B) and (C) with respect to acts occurring on or after June 18, 2008.

## COUNT TWO

### VIOLATION OF SECTION 4b(a) OF THE ACT:
### FRAUD IN CONNECTION WITH FOREX

72.     The allegations set forth in paragraphs 1 through 62 are re-alleged and incorporated by reference herein.

73.     Sections 4b(a)(2)(A), (B) and (C) of the Act, as amended by the CRA, make it unlawful

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract

21

or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

74.     Section 4b of the Act, as amended by the CRA, applies to Defendants' foreign currency transactions "as if" they were a contract of sale of a commodity for future delivery.  *See* Section 2(c)(2)(C)(iv) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iv).

75.     From at least June 18, 2008 and continuing through August 2009, Defendants violated Sections 4b(a)(2)(A), (B) and (C) of the Act, as amended by the CRA, in or in connection with forex contracts, made or to be made, for or on behalf of, or with, other persons, by, among other things:  (1) soliciting investments through fraudulent misrepresentations about Integra Capital's past and current trading performance and the risk of loss; (2) misappropriating funds received from participants for the purpose of trading forex; and (3) issuing false reports to participants.

76.     The actions and omissions of Whitney and Cox, as described in this Count Two, were committed within the scope of their employment with Integra Capital and, therefore, Integra Capital is liable for their violations of Section 4b of the Act pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

77.     During the relevant time, Whitney and Cox directly and indirectly controlled Integra Capital, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Two.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Whitney and Cox are therefore liable for the violations described in this Count Two to the same extent as Integra Capital.

78. Each material misrepresentation or omission and false report from at least September 2006 to August 2009, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(A), (B) and (C) of the Act, as amended by the CRA.

## COUNT THREE

### VIOLATIONS OF SECTION 4*o*(l) OF THE ACT:
### FRAUD BY COMMODITY POOL OPERATORS AND THEIR
### ASSOCIATED PERSONS

79. The allegations set forth in paragraphs 1 through 62 are re-alleged and incorporated by reference herein.

80. Sections 4*o*(1)(A) and (B) of the Act, 7 U.S.C. §§ 6*o*(1)(A) and (B), prohibit any CPO and any AP of a CPO from directly or indirectly employing any device, scheme or artifice to defraud any client, participant or prospective client or participant, or engaging in transactions, practices or a course of business which operate as a fraud or deceit upon any client or participant or prospective client or participant by using the mails or other means or instrumentalities of interstate commerce.

81. Beginning in or about September 2006 and continuing through at least August 2009, Whitney and Cox, while acting as APs of a CPO, and Integra Capital, while acting as a CPO, violated Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1), in that they employed schemes or artifices to defraud pool participants or prospective pool participants or engaged in transactions, practices or a course of business which operated as a fraud or deceit upon pool participants or prospective pool participants by using the mails or other means or instrumentalities of interstate commerce. The fraudulent acts

23

included, but are not limited to the following: (1) soliciting investments through fraudulent misrepresentations about Integra Capital's past and current trading performance and the risk of loss; (2) misappropriating funds received from pool participants for the purpose of trading commodity futures; and (3) issuing false reports to participants.

82.     The actions and omissions of Whitney and Cox, as described in this Count Three, were committed within the scope of their employment with Integra Capital and, therefore, Integra Capital is liable for their violations of Section 4$o$(1) of the Act, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

83.     During the relevant time, Whitney and Cox directly and indirectly controlled Integra Capital and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Three.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Whitney and Cox are therefore liable for the violations described in this Count Three to the same extent as Integra Capital.

84.     Each material misrepresentation or omission made during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4$o$(1) of the Act.

## COUNT FOUR

### VIOLATION OF SECTION 4m(1) OF THE ACT:
### FAILURE TO REGISTER AS A CPO

85.     Paragraphs 1 through 62 are re-alleged and incorporated by reference herein.

86.     With certain exemptions and exclusions not applicable here, all CPOs making use of the mails or any instrumentality of interstate commerce in connection with their operation of a commodity pool are required by Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006), to be registered with the Commission as CPOs.

87.     Integra Capital used the mails or other instrumentalities of interstate commerce in connection with its activities as a CPO without the benefit of registration as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

88.     Whitney and Cox directly or indirectly controlled Integra Capital and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Integra Capital's violations alleged in this Count Four.  Whitney and Cox are therefore liable for Integra Capital's violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

89.     Each use by Integra Capital of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO without proper registration during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

## COUNT FIVE

### VIOLATION OF SECTION 4k(2) OF THE ACT:
### FAILURE TO REGISTER AS AN AP OF INTEGRA CAPITAL

90.     Paragraphs 1 through 62 are re-alleged and incorporated by reference herein.

91.     With certain specified exceptions and exemptions not applicable here, all APs of CPOs are required by Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006), to be registered with the Commission.  Further, a CPO violates Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006), when it allows an unregistered AP to become or remain associated with a CPO when the CPO knew or should have known that the AP was not registered as such with the Commission.

92.     Whitney and Cox engaged in their solicitation activities for Integra Capital without the benefit of registration as APs of a CPO in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

93.     Integra Capital violated Section 4k(2), 7 U.S.C. § 6k(2) (2006), by allowing Whitney and Cox to act as unregistered APs of the company when it knew or should have known that they were not registered with the CFTC.

94.     The actions or omissions of Whitney and Cox, as described in this Count Five, were done within the scope of their employment with Integra Capital, and therefore, Integra Capital is liable for their violations of Section 4k(2) of the Act, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006).

95.     During the relevant time,Whitney and Cox directly or indirectly controlled Integra Capital and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Integra Capital's violations alleged in this Count Five.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Whitney and Cox are therefore liable for Integra Capital's violations described in this Count Five to the same extent as Integra Capital.

## VI.  <u>RELIEF REQUESTED</u>

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.      An order finding that Whitney, Cox and Integra Capital violated Sections 4b(a)(2)(i), (ii) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i),(ii), (iii) (2006), for violations occurring before June 18, 2008, Sections 4b(a)(1)(A), (B) and (C) and 4b(a)(2)(A), (B) and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A), (B), (C) and 6b(a)(2)(A), (B), (C), for violations on or after June 18, 2008, and Sections 4*o*(1), 4m(1) and 4k(2) of the Act, 7 U.S.C. §§ 6*o*(1), 6m(1) and 6k(2)(2006);

B.      Enter an *ex parte* statutory restraining order and an order of preliminary injunction pursuant to Section 6c(a) of the Act restraining Defendants and all persons or entities insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendants who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1. Destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants, wherever located, including all such records concerning Defendants' business operations;

2. Refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants, wherever located, including all such records concerning Defendants' business operations; and

3. Withdrawing, transferring, removing, dissipating, concealing or disposing of, in any manner, any funds, assets, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account, whether domestic or foreign, held by, under the control, or in the name of the Defendants;

C. Enter orders of preliminary and permanent injunction enjoining Defendants and all persons insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting

in active concert or participation with them who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.     Engaging in conduct in violation of Sections 4b(a)(1)(A), (B) and (C) and/or 4b(a)(2)(A), (B) and (C), of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A), (B), (C) and 6b(a)(2)(A), (B), (C);

2.     Engaging in conduct in violation of Sections 4o(1), 4m(1) and/or 4k(2) of the Act, 7 U.S.C. §§ 6b, 6o(1), 6m(1) and 6k(2) (2006);

3.     Trading on or subject to the rules of any registered entity, (as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006));

4.     Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2009)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

5.     Having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

6. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

7. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

8. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2009); and

9. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2009)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2009).

D. Enter an order directing that Defendants make an accounting to the Court of all of Defendants' assets and liabilities, together with all funds Defendants received from and paid to pool participants and other persons in connection with commodity futures, options and forex transactions or purported commodity futures, options and forex transactions, including the names, mailing addresses, email addresses and telephone

numbers of any such persons from whom they received such funds from September 1, 2006 to the date of such accounting, and all disbursements for any purpose whatsoever of funds received from pool participants and other persons, including salaries, commissions, fees, loans and other disbursements of money and property of any kind, from September 1, 2006 to and including the date of such accounting;

   E.  Enter an order requiring Defendants immediately to identify and provide an accounting of all assets and property that they currently maintain outside the United States, including, but not limited to, all funds on deposit in any financial institution, futures commission merchant, bank, or savings and loan accounts held by, under the control of, or in the name of Whitney, Cox or Integra Capital, whether jointly or otherwise, and requiring them to repatriate all funds held in such accounts by paying them to the Clerk of the Court, or as otherwise ordered by the Court, for further disposition in this case;

   F.  Enter an order requiring Defendants to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act as described herein, including pre-judgment interest;

   G.  Enter an order directing the Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the

participants whose funds were received by them as a result of the acts and practices which constituted violations of the Act, as described herein;

H.      Enter an order requiring Defendants to make restitution by making whole each and every pool participant or other person whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

I.      Enter an order requiring Defendants to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the greater of: (1) triple the monetary gain to Defendants for each violation of the Act, or (2) a penalty of $130,000 for each violation from October 23, 2004 through October 22, 2008, or (3) a penalty of $140,000 for each violation on or after October 23, 2008 to the present;

J.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (1994); and

K.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.


Dated:  September 28, 2010

                              Respectfully Submitted,

                              /s/ David Slovick

                              David Slovick (Illinois ARDC No. 6257290)
                              Senior Trial Attorney
                              dslovick@cftc.gov

/s/ Susan J. Gradman

Susan J. Gradman (Illinois ARDC No. 6225060)
Chief Trial Attorney
*sgradman@cftc.gov*


/s/ Scott R. Williamson

Scott R.Williamson (Illinois ARDC No. 06191293)
Deputy Regional Counsel
*swilliamson@cftc.gov*


/s/ Rosemary Hollinger

Rosemary Hollinger (Illinois ARDC No. 3123647)
Regional Counsel and Associate Director
*rhollinger@cftc.gov*

COMMODITY FUTURES TRADING
COMMISSION
525 W. Monroe St., Suite 1100
Chicago, IL  60661
(312) 596-0523 (Gradman direct dial)
(312) 596-0520 (Hollinger direct dial)
(312) 596-0560 (Williamson direct dial)
(312) 596-0714 (facsimile)

Gill P. Beck
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
101 South Edgeworth Street
P.O. Box 1858
Greensboro, N.C. 27402
Tel: 336-332-6304
Fax: 336-333-5257
E-mail: *Gill.Beck@usdoj.gov*

Local Counsel